DAVID J. VANHAVERMAAT, Cal. Bar No. 175761
Email:  vanhavermaatd@sec.gov
YOLANDA OCHOA, Cal. Bar No. 267993
Email: ochoay@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| PATRICK S. CARTER, 808 RENEWABLE ENERGY CORPORATION, 808 INVESTMENTS, LLC, MARTIN J. KINCHLOE, PETER J. KIRKBRIDE, WEST COAST COMMODITIES, LLC, THOMAS A. FLOWERS, and T.A. FLOWERS LLC, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because defendants 808 Renewable Energy Corporation, 808 Investments, LLC, West Coast Commodities, LLC, and T.A. Flowers LLC each have their principal place of business in this district and because defendants Patrick S. Carter, Martin J. Kinchloe, Peter J. Kirkbride, and Thomas A. Flowers reside in this district.

## SUMMARY

4.     This matter involves the fraudulent and unregistered offer and sale of securities by Patrick Carter ("Carter") through a company he founded and managed, 808 Renewable Energy Corporation ("808 Renewable").  Peter Kirkbride ("Kirkbride"), 808 Renewable's chief operating officer, and two sales representatives for 808 Renewable, Martin Kinchloe ("Kinchloe") and Thomas Flowers ("Flowers"), also perpetrated the fraud and carried out the illegal securities offerings.

5.     808 Renewable owns cogeneration equipment that produces electricity and energy on-site at customers' facilities, and which is supposed to generate revenue from the sale of the electricity and energy produced by the company's cogeneration systems.  From 2009 through 2014, the defendants engaged in a scheme where they offered and sold securities in 808 Renewable, raising over $30 million from over 500 investors nationwide in fraudulent and unregistered offerings.

6.     When selling shares of 808 Renewable, the defendants represented to investors and prospective investors that the company was engaged in the renewable and efficient energy business.  As part of their campaign to raise capital, the defendants circulated private placement memoranda, or "PPMs," and made oral statements representing that investor funds would be used to acquire new equipment, to expand 808 Renewable's business, and for other business-related expenditures. The defendants also represented that if any commissions were paid in connection with the sale of 808 Renewable securities, they would not exceed 10% and would be paid only to registered brokers.  In addition, some of the defendants represented that 808 Renewable was generating positive cash flow that would be used to pay monthly or quarterly dividends to investors.  Carter also told prospective investors that the company's shares had been pre-approved by the New York Stock Exchange ("NYSE") for listing on the American Stock Exchange ("AMEX").

7.     Contrary to these representations, Carter misappropriated about half of the money raised from investors to support his lavish lifestyle and to pay substantial sales commissions of up to 25% to the sales agents who helped Carter perpetrate the fraud.  Carter and Kirkbride personally authorized these misuses of company funds. Carter and Kirkbride also authorized the use of investor funds for other undisclosed and improper purposes, including the payment of Ponzi-like "dividends" to existing investors with funds invested by new investors.  In addition, contrary to Carter's representations to investors, 808 Renewable had never been approved or pre-approved for listing on AMEX.

8.     By lying to investors and perpetrating their fraudulent scheme, all of the defendants violated the antifraud provisions of Sections 17(a) of the Securities Act, and violated and/or aided and abetted violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  In addition, each of the defendants, except for Kirkbride, violated the securities registration provisions of Section 5 of the Securities Act. Carter, Kinchloe, Flowers, and the limited liability companies that they controlled

also violated the broker-dealer registration provisions of Section 15(a)(1) of the Exchange Act.

## THE DEFENDANTS

9. **Patrick S. Carter**, age 45, resides in Newport Beach, California. Carter was registered as an investment adviser with the SEC from October 2006 through August 2007, and was associated with a FINRA-registered broker-dealer from September 2006 through July 2007. On December 3, 2009, the Texas State Securities Board issued a cease-and-desist order finding that Carter and other parties had made materially misleading and deceptive statements in connection with the offer and sale of securities while not registered as dealers or agents in that state. On January 20, 2010, the California Department of Corporations issued a desist-and-refrain order against Carter and others finding that Carter had failed to disclose the Texas order to prospective investors in California and that, from 2005 through 2009, Carter offered and sold securities in California by means of "communications which omitted to state material facts necessary to make the statements made [] not misleading."

10. **808 Renewable Energy Corporation** is a Nevada corporation with its principal place of business in Orange County, California. 808 Renewable was formed by Carter in May 2009, purportedly to acquire, develop, and manage renewable energy projects. The company's stock is quoted over-the-counter and is presently quoted at $0.002 with average daily trading volume of less than 4,000 shares. 808 Renewable is required to file periodic reports, including Forms 10-K and 10-Q, with the SEC, but it is delinquent and has not submitted any reports since it filed its Form 10-K for the fiscal year ended December 31, 2015 on April 22, 2016.

11. **808 Investments, LLC ("808 Investments")** is a California limited liability company solely owned and controlled by Carter. 808 Investments' corporate status has been suspended by the California Franchise Tax Board. 808 Investments is not and has never been registered with the SEC in any capacity.

12. **Peter J. Kirkbride**, age 53, resides in Laguna Niguel, California. From

2009 through 2010, Kirkbride was also engaged as a sales representative for 808 Renewable and, in that role, solicited investors and was paid commissions.  Kirkbride was registered as an investment adviser with the SEC from January 2005 through April 2010, and was associated with a FINRA-registered broker-dealer from October 2004 through August 2009.

13.   **Martin J. Kinchloe**, age 41, resides in Garden Grove, California.  From 2009 through at least 2014 Kinchloe served as a sales representative for 808 Renewable and he was paid approximately $1.8 million in commissions for soliciting investors.  Kinchloe is not and has never been associated with a broker or dealer registered with the SEC.

14.   **West Coast Commodities, LLC ("WCC")**, is a California limited liability company solely owned and controlled by Kinchloe.  Kinchloe used WCC to collect some of the commission payments he received in connection with the sale of 808 Renewable securities.  WCC is not and has never been registered with the SEC in any capacity.

15.   **Thomas A. Flowers,** age 49, resides in Mission Viejo, California.  From 2009 through at least 2014 Flowers worked as a sales representative for 808 Renewable and he was paid approximately $1.3 million in commissions for soliciting investors.  Flowers is not and has never been associated with a broker or dealer registered with the SEC.

16.   **T.A. Flowers LLC ("TAF")**, is a limited liability company that is solely owned and controlled by Flowers.  Flowers used TAF to collect some of the commission payments he received in connection with the sale of 808 Renewable securities.  TAF is not and has never been registered with the SEC in any capacity.

## THE ALLEGATIONS

**A.    808 Renewable and Its Officers and Sales Agents**

17.   Since its formation in 2009, 808 Renewable has claimed to "manage[] combined heat and power… renewable energy projects" for public entities and

industrial firms with the "goal [] to help America focus on renewable and green energy solutions in order to reduce [] dependence on foreign oil." 808 Renewable owns and operates cogeneration equipment that is installed on customer sites to generate revenues from the sale of electricity generated by those systems. 808 Renewable has never been profitable and by 2015 the company had only four operational systems installed at customer sites. 808 Renewable became a public company on January 24, 2014.

18. By August 2010, 808 Renewable owned all membership interests of two subsidiaries purportedly formed to acquire combined heat and power plants: 808 Energy 2, LLC and 808 Energy 3, LLC. These subsidiaries were dissolved on April 23, 2012.

19. Carter and Kirkbride were the key officers and directors of 808 Renewable. Carter founded the company and has served as its president, secretary, treasurer, and director since the company's inception. Carter also served as the company's chief executive officer from 2009 through September 2010, and from November 2011 through the present. Kirkbride has been 808 Renewable's chief operating officer since 2010.

20. Kinchloe and Flowers were sales agents for 808 Renewable. From 2009 through at least 2014, Kinchloe was a sales representative for 808 Renewable and he was paid approximately $1.8 million in commissions for soliciting investors. Flowers was a sales representative from 2009 through at least 2014, and was paid approximately $1.3 million in commissions for soliciting investors. Kinchloe served as a director of 808 Renewable and a member of the audit committee for 808 Renewable's board from August 2012 through October 2012.

**B.    The Unregistered Fraudulent Offerings**

21. From at least 2009 through 2014, the defendants raised over $30 million from over 500 investors nationwide by offering and selling five different types of securities in 808 Renewable.

22.     As alleged in more detail below, the offer and sale of units in 808 Energy 3, LLC, which were converted to 808 Renewable common stock, and the offer and sale of 808 Renewable common and series B stock, constituted a single offering.  These securities were offered and sold pursuant to one of three PPMs.  At least one investor who purchased shares in 808 Renewable was given the PPM for 808 Energy 3, LLC in connection with her purchase of 808 Renewable stock.

23.     When the offering pursuant to the PPMs was carried out, Carter had common control over both 808 Renewable and 808 Energy 3, LLC.  While offering these securities, each issuer was engaged in the same type of business, raising investor capital that purportedly would be used to acquire and maintain cogeneration systems that would generate energy that the issuers would, in turn, sell to its customers.  Both issuers shared office space, management, employees, and sales representatives.

24.     The offering of securities of 808 Renewable and 808 Energy 3, LLC was also a part of a single plan of financing and purportedly for the same general purpose, namely to raise funds for 808 Renewable's operations.  All of the sales raised cash as consideration.  Because the 808 Energy 3, LLC units were converted to 808 Renewable stock by 2010, they all involved stock in one issuer, 808 Renewable. During September 2010, the offering of units overlapped with the offering of 808 Renewable common stock and, from January 2011 through February 2012, the offering of common stock overlapped with the offering of 808 Renewable series B shares.

### 1.     Units in 808 Energy 3, LLC, Converted to 808 Renewable Stock

25.     From 2009 through at least September 2010, the defendants distributed a PPM dated August 12, 2009 for units in 808 Energy 3, LLC ("August 2009 PPM"). Under the direction of Carter and 808 Renewable, Kirkbride, Kinchloe, Flowers, and other sales representatives distributed the August 2009 PPM to prospective investors.

26.     The defendants raised approximately $7.5 million from about 200

COMPLAINT                                             7

investors in connection with the offering of 808 Energy 3, LLC units.

27.    By September 2010, all units in 808 Energy 3, LLC were exchanged for common stock in 808 Renewable.  In 2012, 808 Energy 3, LLC, which was by then a wholly-owned subsidiary of 808 Renewable, dissolved.

**2.    Common Stock in 808 Renewable**

28.    From at least 2010 through at least October 2012, the defendants distributed a PPM dated October 11, 2010 for common stock in 808 Renewable ("October 2010 PPM").  Under the direction of Carter and 808 Renewable, Kinchloe, Flowers, and other sales representatives distributed the October 2010 PPM to prospective investors.

29.    The defendants raised approximately $4.5 million from about 150 investors in connection with the offering of 808 Renewable common stock.

**3.    Series B Stock in 808 Renewable**

30.    From at least January 2011 through approximately February 2012, the defendants distributed a PPM dated January 28, 2011 for series B preferred stock in 808 Renewable ("January 2011 PPM").  Under the direction of Carter and 808 Renewable, Kinchloe, Flowers, and other sales representatives distributed the January 2011 PPM to prospective investors.

31.    The defendants raised approximately $3.5 million from over 60 investors in connection with the offering of 808 Renewable series B stock.

**4.    Carter's Founder Shares (Common Stock in 808 Renewable)**

32.    From about October 2011 through approximately July 2014, Carter offered and sold his "founder shares" in 808 Renewable, representing that he was selling only a "limited" amount of his shares at a discount to avoid taking a salary.

33.    During prerecorded shareholder conference calls, for which links were emailed to investors, Carter encouraged existing investors to invest in his founder shares and to refer the offering to their friends and family.  Kinchloe, Flowers, and other sales representatives also pitched the founder shares to investors and

prospective investors whom they initially contacted in connection with the offering made pursuant to the PPMs.

34.    Carter pitched the offer and sale of founder shares as beneficial to the company and investors.  He claimed that he would continue providing services as CEO while waiving his salary, and that investors who purchased his discounted founder shares at $0.75 (a purported discount from the $1.00 per share company shares) would allegedly have greater profit margins when the company became publicly listed.

35.    Carter sold the majority of his founder shares, raising approximately $14 million.

36.    Carter engaged Kinchloe, Flowers, and other sales representatives to offer and sell his founder shares, and he paid them commissions of up to 25% for these sales.  From 2011 through at least 2012, the sales representatives were simultaneously offering and selling Carter's founder shares and shares in 808 Renewable pursuant to one of the PPMs.

37.    Carter used unregistered brokers to solicit investors and sell his founder shares.  In at least two instances, he failed to limit the shares he sold in any three month period to no more than 1% of the common shares outstanding for 808 Renewable.

38.    Carter did not file a Form 144 in connection with his sale of founder shares.

39.    Carter sold founder shares to over 100 investors nationwide and generally solicited some of the sales.  Many of the individuals were unsophisticated investors and some were also unaccredited.  Existing investors were urged to solicit family members to purchase founder shares, without regard to the sophistication of those referred.

**5.    Series D Stock in 808 Renewable**

40.    In or about October 2014, 808 Renewable offered and sold series D

1  preferred stock.

2      41.    This offering was announced in an October 17, 2014 press release issued

3  by 808 Renewable.  At the direction of Carter and 808 Renewable, Kinchloe and

4  Flowers circulated emails to investors promoting the offering.

5      42.    808 Renewable raised approximately $5.5 million from at least two

6  investors in connection with the offering of 808 Renewable series D stock.

7  **C.**    **The Defendants' Solicitation Efforts**

8      43.    To sell the 808 Renewable securities, Carter and 808 Renewable hired

9  sales representatives to solicit investors and paid them a percentage of each of their

10  sales as commission.

11      44.    Investors were generally solicited through cold calls, mass emails, or a

12  televised advertisement.

13      45.    The offerings of 808 Renewable securities other than the series D

14  preferred stock were made to investors in multiple states.  Nationwide, over 500

15  investors purchased 808 Renewable securities.

16      46.    Over $15 million in 808 Renewable securities was offered and sold in

17  these offerings.

18      47.    None of the defendants made any meaningful effort to determine

19  whether the investors were or accredited or sophisticated.  Some investors were

20  unaccredited.  Indeed, some of the investors had no experience trading in securities

21  prior to their investment in 808 Renewable.

22      48.    The investors were not provided with any audited financial statements.

23  The defendants did not provide the kind of information that an adequate registration

24  statement would reveal.

25      49.    Carter and his sales representatives told prospective investors that 808

26  Renewable was engaged in the renewable energy industry, and the PPMs that the

27  defendants distributed to prospective investors similarly represented that the company

28  was formed "for the purpose of acquiring, developing, owning and managing

renewable and efficient energy projects throughout the United States."

50.     Carter reviewed and approved the content of all of the PPMs distributed to investors for the offer and sale of the units in 808 Energy 3, LLC, and of the common and series B stock of 808 Renewable (namely, the August 2009 PPM, the October 2010 PPM, and the January 2011 PPM).

51.     Carter also participated in and spoke during the prerecorded conference calls in November 2013 and other telephone calls with investors when his founder shares were offered.

52.     Carter also drafted the language of the October 17, 2014 press release and emails announcing and promoting the offer and sale of 808 Renewable's series D stock.

53.     As part of their investor solicitation efforts, the defendants engaged in several forms of general solicitations.

54.     At the direction of Carter and 808 Renewable, sales representatives, including Kinchloe and Flowers, made cold calls to potential investors nationwide using lead lists.  The sales representatives, including Kinchloe and Flowers, used high pressure sales tactics and misleading sales scripts to promote investments in 808 Renewable.

55.     In 2010, 808 Renewable advertised its "investment opportunity" on the television show *Today in America*.  Carter and Kirkbride both appeared in this advertisement and, as part of their 2010 and 2011 sales efforts, Flowers, Kinchloe and other sales representatives mass emailed a link to this televised advertisement to prospective investors.

56.     On October 15, 2012, 808 Renewable filed a registration statement with the SEC and, at Carter's direction, sales representatives circulated this registration statement to attract investors to purchase shares.

57.     Carter, Kinchloe, and Flowers personally met with some investors to persuade them to purchase 808 Renewable securities.

COMPLAINT                                      11

58.     The defendants provided subscription agreements to investors who agreed to purchase shares of 808 Renewable.  The subscription agreements included a clause under which the investors self-certified that they were accredited.  Even though the offerings were supposed to be limited to accredited investors, the defendants took no steps to verify that investors were accredited and that the self-certifications were accurate.

59.     In fact, some investors were not accredited or had no prior experience investing in stock.  Further, some of these investors made clear to the 808 Renewable sales representatives who solicited them that they had had little to no experience investing in securities.

60.     Some investors used their retirement funds to invest in 808 Renewable. Kinchloe provided instructions to some investors regarding rolling over their retirement funds to self-directed IRAs so that investors could use their retirement money to invest in 808 Renewable.

61.     Once an investor made an initial purchase, Carter, Kinchloe, Flowers, and other sales representatives urged the investor to invest more funds before the allegedly imminent initial public offering.  808 Renewable's sales representatives referred to this practice of persuading investors to increase their investment as "reloading."

62.     Flowers and Kinchloe offered to pay some investors referral fees and commissions to convince them to reload and to refer their friends and family.

**D.     The Defendants' Misrepresentations and Omissions of Material Fact**

63.     In connection with the offerings of 808 Renewable securities, the defendants misrepresented information, made misleading statements, and omitted material facts.  These misrepresentations and omissions related to, among other things, (i) the payment of commissions to 808 Renewable's sales agents, (ii) how investor funds would be used, (iii) investors purportedly earning cash flow and receiving monthly or quarterly dividend payments, and (iv) representations that 808

Renewable had been preapproved by the NYSE for listing on AMEX.

**1.     Misrepresentations Regarding the Payment of Commissions**

64.     808 Renewable, Carter, and Kinchloe, as well as their companies (808 Investments and WCC), made materially false statements regarding the payment of commissions to sales representatives.

65.     Each of the defendants circulated PPMs to investors and prospective investors in connection with the offer or sale of 808 Renewable securities (specifically, the 808 Energy 3, LLC units, and the 808 Renewable common stock and series B preferred stock). All of these PPMs falsely represented that only "up to 10%" of the proceeds of the offerings could be paid in commissions to "broker-dealers."

66.     The August 2009 PPM for the sale of units in 808 Energy 3, LLC represented that, if commissions were paid, FINRA registered brokers would be engaged. Specifically, the August 2009 PPM stated "We have not entered into any agreements or commitments to pay any commission. However, we may pay up to 10% of the proceeds of the offering to broker dealers registered with the Financial Industry Regulatory Authority ('FINRA')."

67.     Also in connection with the offering of 808 Energy 3, LLC units, Carter, as president of the company, executed and filed a Notice of Exempt Offering of Securities ("Form D") with the SEC on February 2, 2010, where he represented that "No Agreements with FINRA registered Broker dealers have been signed, but the Company may pay commissions up to [$1 million of the $10 million total offering amount] if such broker dealers are engaged."

68.     The October 2010 and January 2011 PPMs for the offer and sale of 808 Renewable's common and series B stock also misleadingly implied that commissions would not be paid. The October 2010 PPM for the sale of common stock stated "We are acting as our own agent with respect to the Shares being offered pursuant to this Memorandum. To the extent shares are sold directly by us, no commissions will be

paid, and the proceeds allocated for commissions will be used by us as additional working capital.  We reserve the right to enter into agreements with one or more broker-dealers to sell the shares, with such broker-dealers receiving commissions of up to 10% of the price of the Shares in the form of cash or Shares in connection with this offering."

69.     The January 2011 PPM for the sale of series B shares contained identical representations regarding commissions as the defendants made in the October 2010 PPM.

70.     In a Form D that 808 Renewable filed with the SEC on July 26, 2011 in connection with the series B share offering, 808 Renewable represented that the amounts of sales commissions and finders fees expenses in connection with the sale of 808 Renewable's series B shares were "$0."

71.     On July 7, 2012, Carter, in his capacity as president of 808 Renewable, executed and filed a Form D with the SEC in connection with 808 Renewable's common stock offering.  In this July 7, 2012 Form D, Carter and 808 Renewable represented that the amounts of sales commissions and finders' fees expenses in connection with the offering of 808 Renewable common stock were "$0."

72.     In the conference calls and telephone calls in which Carter's founder shares were offered, and in the October 17, 2014 press release and emails announcing and promoting the offer and sale of 808 Renewable's series D stock, it was never disclosed that up to 25% of the investments would be paid in commissions, including to non-FINRA registered brokers, as well as commissions to Carter.

73.     Kinchloe falsely told at least one investor that he was only receiving commissions in shares of the company, rather than in cash, because Kinchloe allegedly was waiting for the company to become publicly listed in order to get a large payout from his shares.

74.     The defendants' representations regarding commissions were false because 808 Renewable always paid commissions either to 808 Investments, which

then paid the sales representatives, or directly to the sales agents.  Also, those commissions exceeded 10% and generally were as high as 25%, the commissions were not paid only to FINRA registered brokers, and the commissions were paid to people affiliated with 808 Renewable including Carter, Kinchloe, and Flowers.

75.    Carter used his company, 808 Investments, to collect commissions from 808 Renewable at rates of up to 25% of the investor capital that was raised.  Carter sometimes referred to these commissions as "consulting fees."  Carter sometimes used these fees to pay commissions to the sales representatives according to the rates to which the sales representatives had agreed with Carter.

76.    For example, when Flowers first joined 808 Renewable, he was paid 15% of the funds raised from investors he successfully solicited.  Carter's company, 808 Investments, collected a commission of 25% of the investments Flowers solicited, and Carter passed on 15% to Flowers, and kept 10% for himself.

77.    Kinchloe generally earned a 25% commission on amounts that he raised. When Kinchloe and Flowers worked together to solicit an investment, they would split a 25% commission on funds they raised as a team.

78.    After each sale, Kinchloe, Flowers, and other sales representatives filled out forms seeking payment of commissions for their sales.  These forms showed that sales representatives collected commissions as high as 25% for each sale.

79.    808 Renewable's bookkeeper prepared reports that showed that 808 Renewable would pay 808 Investments, which was Carter's LLC, purported consulting fees in an amount as high as 25% of funds raised from investors.  Carter and Kirkbride reviewed and approved these reports, and authorized the payments to 808 Investments.

80.    In connection with a July 31, 2013 audit confirmation letter, Carter signed the letter acknowledging that, from January 2012 through September 2012, 808 Investments had been paid 25% of the proceeds from the sales of 808 Renewable stock as purported "finders' fees."

81.     Investors were never told, and did not know, that sales representatives received commissions as high as a quarter of the capital they were investing in 808 Renewable.

82.     Investors were never told, and did not know, that Carter himself was collecting commissions or consulting fees for raising capital for 808 Renewable.

83.     Investors were never told, and did not know, that 808 Renewable paid commissions to brokers who were not registered with FINRA.

84.     Carter's, 808 Renewable's, 808 Investments', Kinchloe's, and WCC's misrepresentations and omissions regarding commissions were material because reasonable investors would have considered it important to know that up to 25% of their investment would be paid in commissions, including to non-FINRA registered brokers, as well as commissions to Carter, the CEO and president of the company, in deciding whether to invest in 808 Renewable.

**2.     Misrepresentations and Omissions Regarding the Use of Offering Proceeds**

85.     808 Renewable, Carter, and his company, 808 Investments, made materially false statements regarding the use of offering proceeds.

86.     Carter, 808 Renewable, and 808 Investments misrepresented that investor funds would be used for legitimate business purposes.  Instead, Carter, with the help of Kirkbride, used substantial amounts of investor funds for improper and undisclosed purposes, including to support his lavish lifestyle.

87.     Carter and his sales representatives represented orally to investors that their capital would be used to acquire new cogeneration equipment, maintain current assets, and to expand 808 Renewable's business.  The PPMs that the defendants distributed to investors and prospective investors similarly stated that 808 Renewable would use investor funds for business-related expenditures, including the acquisition and development of energy generation facilities and working capital.

88.     The August 2009 PPM for units in Energy 3, LLC specifically stated

"We intend to use the proceeds from this offering for investing in, acquiring or developing, and operating, energy generation facilities and projects; procurement of equipment and technology; hiring additional personnel; and general corporate purposes. . . . Pending any of these uses, we plan to invest the proceeds of this offering in bank certificates of deposit or short-term, investment-grade, interest bearing securities."  The August 2009 PPM further specified that 30.75% of the proceeds would be used to acquire cogeneration assets, 16% would be used for maintenance and operating reserves, 45% would be paid to 808 Renewable in connection with the purchase of cogeneration assets and plants, 8.75% would be used for working capital, and 0.5% would be used for offering expenses.

89.     Both the October 2010 and January 2011 PPMs provided that 70% of the offering proceeds would be used for "Investments in and Acquisitions and Development of Energy Generation Facilities and Projects) and 19.8% would be used for working capital.

90.     In the conference calls and telephone calls in which Carter's founder shares were offered, and in the October 17, 2014 press release and emails announcing and promoting the offer and sale of 808 Renewable's series D stock, it was never disclosed that investor funds were being used for improper and undisclosed purposes.

91.     Contrary to the representations to investors, only about half of the capital raised from investors was used for legitimate business expenses.  From 2009 through early 2015, 808 Renewable generated approximately $5 million from business operations and raised approximately $21 million from investors who purchased shares directly from the company (as opposed to those who purchased Carter's founder shares).  Approximately half of these funds went directly to Carter or 808 Investments: approximately $10 million (or about 38% of the $26 million) was transferred from 808 Renewable to Carter and 808 Investments, approximately $2.7 million (or about 10%) of investor funds was deposited directly with 808 Investments, and approximately $12.7 million (or about 48%) was spent on business

expenses.

92.    Carter used the funds he misappropriated from 808 Renewable to support his lifestyle and to pay commissions to the sales representatives who helped him defraud investors.

93.    For example, in 2009, 808 Investments paid over $220,000 for boats and cars for Carter, $246,000 to pay Carter's personal credit card bills, and over $40,000 to cover additional personal expenses of Carter's, including trips, jewelry, art, and gambling.  Carter's 2009 personal expenses were largely paid by funds traced to 808 Renewable investors.

94.    In 2014, 808 Renewable remained unprofitable and its independent auditor issued a "going concern" qualification when it completed the company's most recent audit.  Despite this, Carter continued to misappropriate funds from the company, using over $3 million of 808 Renewable's funds for his benefit: $2.2 million was used to redeem Carter's series A shares, approximately $600,000 was used to repay a purported loan made by Carter to 808 Renewable Energy, and $360,000 was used to pay Carter's 2014 salary.

95.    In early 2015, when company funds were largely depleted and no additional investor funds were being raised, 808 Renewable paid Carter a bonus of $360,000 and a salary of $125,000.  In 2015, Kirkbride also was paid a bonus of $150,000 in addition to his $139,000 salary.  Carter and Kirkbride approved each other's 2015 bonuses.

96.    Carter and Kirkbride both reviewed bookkeeping reports that were generated during this period reflecting the improper use of 808 Renewable funds, and both approved these improper uses.

97.    Carter's, 808 Renewable's, and 808 Investments' misrepresentations and omissions regarding the use of investor funds were material because reasonable investors would have considered it important to know that substantial portions of their investments were being funneled to Carter or an entity that he controlled in

1   deciding whether to invest in 808 Renewable.

2   **3.      Misrepresentations and Omissions Regarding 808 Renewable**

3   **Generating Cash Flow to Pay Dividends**

4        98.    808 Renewable, Carter, and his company, 808 Investments, made

5   materially false statements regarding 808 Renewable purportedly generating cash

6   flow to pay dividends or distribution to investors.

7        99.    In order to induce investors to buy 808 Renewable securities, Carter, 808

8   Renewable, and 808 Investments misrepresented that 808 Renewable was generating

9   a cash flow that enabled it to pay a 12% annual return in the form of dividends or

10  distributions until the company went public.

11       100.   In the February 2010 *Today in America* broadcast, Carter stated "we are

12  currently looking for the right investors that [sic] are interested in hard assets that

13  produce cash flow." In this same broadcast, investors were told that each investor

14  "buys a part of the company as such they own shares and receive dividends…."

15       101.   In a September 7, 2010 email, Carter wrote to an investor "You will get

16  the 10 percent within 60 days…Also the cash flow will be over 20 percent annually.

17  This is your chance….We should be public in 90 days."

18       102.   Sales representatives working under Carter's direction also told

19  prospective investors that they would receive monthly dividends if they invested in

20  808 Renewable.  For example, a solicitation script that Kirkbride reviewed and

21  revised for a sales representative in 2011 stated "we have an offering that helps to

22  mitigates [sic] risk, provides steady monthly cash flow…this is a 'Turn Key'

23  operation that allows your money to be invested in energy producing hard assets,

24  providing you stable Income of 12% annually paid monthly, Short & Long-term

25  Growth and the Stability of a utility."

26       103.   In the October 17, 2014 press release and emails announcing and

27  promoting the offer and sale of 808 Renewable's series D stock, Carter represented

28  that the series D stock offered "an annual return of twelve percent (12%) that is paid

COMPLAINT                              19

1    quarterly."

2        104.   At the direction of Carter, sales representatives circulated marketing

3    material to prospective investors that stated one of the benefits of investing in 808

4    Renewable was the "monthly cash flow."

5        105.   Investors did not know that 808 Renewable was cash-strapped and that

6    Carter was depleting the company's funds.

7        106.   Because 808 Renewable was facing financial challenges, new investor

8    capital was used to pay dividends and distributions to existing investors.  The use of

9    new investor capital to pay dividends and distributions to existing investors was never

10   disclosed to investors.

11       107.   From 2011 through 2012, at least $250,000 of new investor funds was

12   used to pay purported dividends or distributions to existing investors.

13       108.   Carter and Kirkbride authorized the use of new investor funds to make

14   the Ponzi-like dividend payments to existing investors.

15       109.   By late 2011 and early 2012, the Ponzi-like dividend structure began to

16   collapse when the company was unable to pay outstanding vendor invoices for the

17   legitimate part of its business, and new investor funds were insufficient to continue to

18   support the Ponzi-like payments.

19       110.   Rather than disclose its poor financial condition to investors, on June 15,

20   2012, Carter informed investors about a "brand new dividend reinvestment program"

21   that would provide dividends in the form of additional stock instead of cash.  Carter

22   further explained that this program would allow the company to "use the cash not

23   distributed to grow business" and would be a "benefit to you the investor" because

24   "you get additional stock at a reduced amount."  This representation, which was false

25   because the company did not have cash to distribute or to grow the business, was

26   used to lull investors.

27       111.   Carter's, 808 Renewable's, and 808 Investments' misrepresentations and

28   omissions regarding 808 Renewable's purported cash flow and dividend payments,

1  which Kirkbride aided and abetted, were material because reasonable investors would

2  have considered it important to know that the company was not generating sufficient

3  cash flow to pay dividends to investors, but rather the defendants were using new

4  investor capital to pay dividends to existing investors.

5      **4.      Misrepresentations Regarding 808 Renewable's Pre-Approval by the**

6              **NYSE for Listing On AMEX**

7          112.   808 Renewable, Carter, and his company, 808 Investments, made

8  materially false statements regarding 808 Renewable's purported pre-approval by the

9  NYSE for listing on AMEX.

10         113.   Throughout 2009 to 2012, Carter told prospective investors that 808

11  Renewable was well-positioned to be listed on NASDAQ or on the NYSE.

12         114.   On November 13, 2013, Kinchloe and Flowers emailed investors

13  regarding a "Pre-Approval" by the "NYSE (AMEX)."  The email linked to a

14  prerecorded conference call during which Carter announced that the company had

15  been "given preliminary approval" by representatives from the NYSE for listing on

16  AMEX.  In this recording, Carter also encouraged investors to refer the "investment

17  opportunity" to friends and family and to purchase his founders shares before the

18  company's IPO.

19         115.   In the recorded conference call that was linked in emails that Kinchloe

20  and Flowers disseminated to investors, Carter also represented that "the minimum to

21  list on the AMEX is $4 per share."

22         116.   Contrary to Carter's representations to investors, 808 Renewable was

23  never approved or preliminarily approved for listing on AMEX.

24         117.   Carter made over $3 million from the sale of founder shares from

25  November 14, 2013 (after his false announcement regarding AMEX pre-approval)

26  through April 2014 (before it was disclosed to investors that 808 Renewable would

27  be an OTCQX-listed company (*i.e*., that its securities would trade over-the-counter

28  and not on AMEX)).

COMPLAINT                              21

118.   Carter's misrepresentations and omissions regarding the purported AMEX pre-approval were material because a reasonable investor would have considered it important to know that 808 Renewable was never pre-approved by the NYSE for listing on the AMEX in making an investment decision, particularly in light of Carter's representation that an AMEX listing required a minimum stock price of $4 per share.

119.   808 Renewable's stock is currently quoted over-the-counter at $0.002 per share, with its total trading volume averaging less than $8 per day.

**E.    Kirkbride, Kinchloe, Flowers, and Their Companies Aided and Abetted The Misrepresentations and Omissions**

120.   Kirkbride, Flowers, Kinchloe, and their companies (Flower's TAF and Kinchloe's WCC) substantially assisted the making of the materially false statements and omissions by Carter, 808 Renewable, and 808 Investments regarding the payment of commissions to sales representatives.

121.   Kirkbride reviewed the PPMs that contained these false statements, and distributed those PPMs to prospective investors.  Kirkbride also approved the cash flow reports that provided detailed information regarding the commission payments, and he, along with Carter, authorized those large commission payments to Carter's company, 808 Investments.

122.   Kinchloe and Flowers, and their companies, also distributed the PPMs to prospective investors and received commissions of as high as 25% on amounts raised from investors.

123.   Kirkbride also provided substantial assistance to the making of the materially false statements regarding the use of offering proceeds and the alleged generation of cash flow to pay dividends to investors.

124.   Kirkbride authorized the transfer of funds from 808 Renewable to 808 Investments to pay purported consulting fees.  The cash flow reports that Kirkbride authorized also detailed the payment of the Ponzi-like payments to investors and

provided detailed information about the transfers of funds to 808 Investments. Kirkbride also revised a sales pitch used by a sales representative to solicit investors that stated that 808 Renewable offered the opportunity to receive a "stable income of 12% paid monthly."

**F.     The Defendants Obtained Money By Means of the Fraud**

125.   Each of the defendants received money by means of the materially untrue statements and omissions alleged above in the offer or sale of the 808 Renewable securities.

126.   808 Renewable received money from investors through the sales of its securities.

127.   Carter and 808 Investments obtained money through the receipt of commissions and the payments of salary and bonuses to Carter, payment for Carter's purported loans and consulting fees, and other substantial sums transferred from 808 Renewable to Carter.  Carter also obtained money from his sale of founder shares.

128.   Kirkbride obtained money in the form of salary and bonuses that 808 Renewable paid him from the funds raised from investors.

129.   Kinchloe, WCC, Flowers, and TAF obtained money in the form of the substantial commissions paid to them from the funds raised from investors.

**G.     The Defendants Engaged in a Fraudulent Scheme**

130.   Each of the defendants engaged in a fraudulent scheme to convince investors to continue to invest in 808 Renewable securities so that each of them could profit financially.

131.   In conference calls and marketing materials to investors and prospective investors, Carter encouraged investors to "take advantage of the opportunity" to receive cash flow while they waited for a "significant increase" in their investments. While encouraging investors to invest, Carter caused substantial funds to be diverted to him and to 808 Investments for Carter's personal use and to make commission payments to Carter and to the sales representatives.

132.   Carter and Kirkbride caused 808 Renewable to make the Ponzi-like dividend payments to investors.  From 2011 through 2012, at least $250,000 of new investor funds was used to pay purported dividends or distributions to existing investors.

133.   When 808 Renewable was no longer raising sufficient investor funds to allow it to continue making the Ponzi-like dividend payments, Carter further extended the scheme by telling investors that their dividends would be reinvested into the company to grow the business.

134.   Carter also began offering his founder shares at a purported discount, representing that only a limited amount of founder shares would be available for a brief time.  While selling his founder shares, Carter made nearly $14 million through the sales of his founder shares while 808 Renewable was losing money.

135.   The cash flow reports that Carter and Kirkbride reviewed and approved identified the Ponzi-like payments, and Kirkbride also reviewed bookkeeping reports that showed that 808 Renewable's revenues were insufficient to support its operations.  Kirkbride also reviewed and revised at least one sales script used to solicit investors, which represented that an investment in 808 Renewable would "provide a steady monthly cash flow."

136.   Kinchloe, Flowers, and their LLCs furthered the scheme by distributing PPMs to investors that provided false information about the amounts of commissions being paid, even while they were receiving commission rates higher than represented in the PPMs.

**H.    The Defendants' Roles in the Fraud**

      **1.    Carter, 808 Renewable and Carter's Company (808 Investments)**

137.   From 2009 through 2014, Carter, 808 Renewable, and 808 Investments raised over $30 million from investors as part of their fraudulent offerings.  Because 808 Renewable and 808 Investments are entities controlled by Carter, and the latter is his alter-ego, Carter's actions and mental state are imputed to both 808 Renewable

1   and 808 Investments.

2        138.   Carter was responsible for the misrepresentations in the PPMs regarding

3   the payment of commissions and the use of investor proceeds because Carter

4   personally reviewed and approved the PPMs, provided the very first draft PPM to

5   counsel as the template for the offering document, and had ultimate authority over the

6   substance of the offering material circulated to investors and prospective investors.

7        139.   Carter also orally made misleading statements to investors that investor

8   funds would be used for 808 Renewable's business purposes.

9        140.   Carter served as a signatory to bank accounts into which investor money

10  was deposited.  Carter directed 808 Renewable to transfer funds to 808 Investments

11  to pay Carter and his sales representatives commissions as high as 25% of the funds

12  raised.  Carter also directed that investor funds be used to repay Carter for loans he

13  purportedly made to the company and to make the Ponzi-like dividend payments to

14  investors.

15       141.   Carter sold his founder shares without disclosing that investor funds that

16  had been raised pursuant to one of the PPMs had largely been depleted by him or

17  used for other improper purposes.

18       142.   Carter knew or was reckless in not knowing that, contrary to the

19  representations he and his sales representatives made to investors, Carter was

20  personally misappropriating substantial amounts of investor funds for his personal

21  use, to pay undisclosed commissions, and for other improper and undisclosed

22  purposes.

23       143.   Carter knew, or was reckless or negligent in not knowing, that the

24  dividend payments made to existing investors were being paid from new investor

25  funds.

26       144.   Carter knew or was reckless or negligent in not knowing that 808

27  Renewable had not been pre-approved for listing on AMEX.  Carter sold a significant

28  amount of his founder shares after making this false announcement.

145.   At all relevant times, Carter, 808 Renewable, and 808 Investments knowingly or recklessly, or by acting negligently, perpetrated their fraudulent scheme, and knew or acted recklessly or negligently in not knowing that their misrepresentations and omissions were false and misleading when made.

**2.     Kirkbride**

146.   Kirkbride engaged in a scheme to continue to convince individuals to invest in 808 Renewable's failing business so that that he could financially profit. For his role in the scheme, from 2010 through 2015, Kirkbride earned a total salary of approximately $670,000 and an additional $190,000 in bonuses.  Further, on August 2014, Carter paid Kirkbride an additional $125,000.

147.   In furtherance of the fraudulent scheme, Kirkbride reviewed and approved financial reports that specified that investor funds would be used to make Ponzi-like dividend payments to existing investors, to pay interest on purported loans Carter had obtained for 808 Renewable, to repay Carter for loans purportedly made to the company, to pay a 25% commission to 808 Investments for capital raised from investors, and for other undisclosed and improper purposes.

148.   Kirkbride served as a signatory to the bank accounts into which investor money was deposited.  Kirkbride authorized the use of investor funds for undisclosed and improper purposes, including to pay money to 808 Investments that was used to pay commissions to Carter and to the sales representatives, and to pay dividends to existing investors with new investors' funds.  Kirkbride also authorized the transfer of company funds to Carter and to 808 Investments.

149.   Kirkbride revised at least one PPM, and reviewed and distributed PPMs to potential investors, knowing that the PPMs contained representations about the commissions paid and use of proceeds that were inconsistent with the financial reports he reviewed and approved.

150.   Kirkbride provided marketing materials for sales representatives to use with prospective investors, reviewed and revised at least one sales script, and

provided guidance to sales representatives regarding how to respond when investors asked about the returns on their investments.

151.   Kirkbride provided substantial assistance to Carter, 808 Renewable, and 808 Investments in connection with misrepresentations they made.

152.   At all relevant times, Kirkbride knowingly, recklessly, or negligently perpetrated the fraudulent scheme, and knew or acted recklessly or negligently in not knowing that his misrepresentations and omissions were false and misleading when made to investors.

### 3.   Kinchloe, Flowers, and Their Companies (WCC and TAF)

153.   In furtherance of the scheme to continue to convince individuals to invest in 808 Renewable's failing business, Kinchloe, Flowers, WCC, and TAF generally solicited and encouraged investors to invest in 808 Renewable.  Kinchloe, Flowers, and their entities solicited investors and distributed offering materials, including the PPMs.

154.   Kinchloe, Flowers, WCC, and TAF distributed PPMs that falsely stated that sales commissions would be limited to 10% and only paid to registered brokers, while they knew or were reckless in not knowing that they were generating commissions as high as 25% and were receiving these commissions despite not being registered brokers.

155.   Kinchloe, Flowers, WCC, and TAF offered commissions or referral fees to some investors in order to convince them to reload or to refer their friends and family.

156.   Kinchloe also knowingly misrepresented to at least one investor that he was paid commissions in only shares of 808 Renewable stock, and not in cash.

157.   From 2009 through 2014, Kinchloe and WCC earned approximately $1.8 million in commissions.

158.   From 2009 through 2014, Flowers and TAF earned approximately $1.3 million in commissions.

159.   At all relevant times, Kinchloe, WCC, Flowers, and TAF knew, or acted recklessly or negligently, in perpetrating the fraudulent scheme, and knew or acted recklessly or negligently in not knowing that their misrepresentations and omissions were false and misleading when made.

## I.   Registration Violations

160.   The offer and sale of 808 Renewable common stock, and the offer and sale of the units in 808 Energy 3, LLC that were converted to that stock, have never been registered with the SEC.

161.   The offer and sale of 808 Renewable series B and series D stock have never been registered with the SEC.

162.   The offer and sale of Carter's founder shares of 808 Renewable has never been registered with the SEC.

163.   808 Investments, WCC, and TAF have never been registered with the SEC as brokers or dealers.

164.   During the period of the offer and sale of 808 Renewable securities, Carter was not associated with a registered broker or dealer and was not registered as a broker-dealer with the SEC.

165.   Kinchloe and Flowers have never been associated with registered brokers or dealers, and have never registered as brokers or dealers.

166.   Carter, 808 Investments, Kinchloe, WCC, Flowers, and TAF each effected or induced the sale of securities while not registered with the SEC as a broker or dealer or affiliated with a broker-dealer registered with the SEC.

167.   Carter oversaw the sales efforts of Kinchloe, Flowers, and other sales representatives.  Through his company, 808 Investments, Carter collected transaction-based compensation based on a percentage of the investor funds raised through the sales efforts.  Carter also used 808 Investments to pay commissions to himself and to his sales representatives.

168.   Kinchloe and Flowers were actively engaged in promoting and selling

808 Renewable securities to investors by calling and emailing potential investors. Kinchloe and Flowers advised investors to purchase the 808 Renewable securities.

169.   Kinchloe and Flowers were paid transaction-based compensation in the form of commissions for selling 808 Renewable securities.

## FIRST CLAIM FOR RELIEF

### Fraud in the Connection with the Purchase and Sale of Securities
### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a) and 10b-5(c) Thereunder
### (Against All Defendants)

170.   The SEC realleges and incorporates by reference paragraphs 1 through 169 above.

171.   As alleged above in paragraphs 130 through 159, among other allegations, each of the defendants participated in activities with the principal purpose and effect of creating a false appearance regarding 808 Renewable's financial condition, including the making of Ponzi-like payments to investors, in order to, among other things, convince investors to continue to invest in 808 Renewable so that the defendants could misappropriate investor funds.

172.   By engaging in the conduct described above, each of the defendants, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

173.   By engaging in the conduct described above, each of the defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of and Aiding and Abetting Violations of**

**Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(Against All Defendants)**

174.   The SEC realleges and incorporates by reference paragraphs 1 through 169 above.

175.   As alleged above in paragraphs 63 through 84 and 137 through 159, among other allegations, Defendants Carter, 808 Renewable, 808 Investments, Kinchloe, and WCC made material misrepresentations and omissions to investors and prospective investors regarding, among other things, the payment of commissions to the sales representatives who offered and sold 808 Renewable's securities.

176.   As alleged above in paragraphs 85 through 119 and 137 through 145, among other allegations, Defendants Carter, 808 Renewable, and 808 Investments also made material misrepresentations and omissions to investors and prospective investors regarding the use of the proceeds from 808 Renewable's securities offerings, the existence of cash flow from 808 Renewable's business activities sufficient to enable it to pay dividends to investors, and the purported pre-approval of 808 Renewable for listing on the AMEX stock exchange.

177.   By engaging in the conduct described above, Defendants Carter, 808 Renewable, 808 Investments, Kinchloe, and WCC, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

178.   By engaging in the conduct described above, Defendants Carter, 808 Renewable, 808 Investments, Kinchloe, and WCC violated, and unless enjoined will

continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

179.   In the alternative, as alleged above in paragraphs 120 through 122 and 153 through 159, among other allegations, Defendants Kinchloe and WCC knowingly provided substantial assistance to Carter, 808 Renewable, and 808 Investments in their violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder in connection with 808 Renewable's securities offerings.

180.   By engaging in the conduct described above, Defendants Kinchloe and WCC aided and abetted, and unless enjoined will continue to aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

181.   As alleged above in paragraphs 120 through 124 and 146 through 159, among other allegations, Defendants Kirkbride, Flowers, and TAF knowingly provided substantial assistance to 808 Renewable in its violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder in connection with 808 Renewable's securities offerings.

182.   By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Defendants Kirkbride, Flowers, and TAF aided and abetted, and unless enjoined will continue to aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act

### (Against All Defendants)

183.   The SEC realleges and incorporates by reference paragraphs 1 through 169 above.

184.   As alleged above in paragraphs 130 through 159, among other

allegations, each of the defendants participated in a scheme to defraud purchasers of 808 Renewable's securities, and their scheme included the making of Ponzi-like payments to investors to, among other things, convince investors to continue to invest in 808 Renewable so that the defendants could misappropriate investor funds.

185.   By engaging in the conduct described above, each of the defendants, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) with scienter, employed devices, schemes, or artifices to defraud; and (c) with scienter or negligently, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

186.   By engaging in the conduct described above, each of the defendants violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (Against All Defendants)

187.   The SEC realleges and incorporates by reference paragraphs 1 through 169 above.

188.   As alleged above in paragraphs 63 through 119, 125 through 129, and 137 through 159, among other allegations, each of the defendants received money by means of untrue statements and omissions regarding the payment of commissions to the sales representatives who offered and sold 808 Renewable's securities. Defendants Carter, 808 Renewable, 808 Investments, and Kirkbride also received money by means of untrue statements and omissions regarding the use of proceeds from 808 Renewable's securities offerings and the existence of cash flow from 808 Renewable's business activities sufficient to enable it to pay dividends to investors.

Defendants Carter, 808 Renewable, and 808 Investments also received money by means of untrue statements and omissions regarding the purported pre-approval of 808 Renewable for listing on the AMEX stock exchange.

189.   By engaging in the conduct described above, each of the defendants, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, with scienter or negligently, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

190.   By engaging in the conduct described above, each of the defendants violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## FIFTH CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against Defendants Carter, 808 Renewable, 808 Investments, Kinchloe, WCC, Flowers, and TAF)

191.   The SEC realleges and incorporates by reference paragraphs 1 through 169 above.

192.   As alleged above in paragraphs 21 through 62 and 160 through 162, among other allegations, Defendants Carter, 808 Renewable, 808 Investments, Kinchloe, WCC, Flowers, and TAF directly or indirectly offered and sold securities of 808 Renewable in an offering or offerings that were not registered with the SEC.

193.   By engaging in the conduct described above, Defendants Carter, 808 Renewable, 808 Investments, Kinchloe, WCC, Flowers, and TAF, and each of them, directly or indirectly, singly and in concert with others, have made use of the means or instruments of transportation or communication in interstate commerce, or of the

mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

194.   By engaging in the conduct described above, Defendants Carter, 808 Renewable, 808 Investments, Kinchloe, WCC, Flowers, and TAF have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c).

## SIXTH CLAIM FOR RELIEF

### Unregistered Broker-Dealer

### Violation of Section 15(a) of the Exchange Act

### (Against Defendants Carter, 808 Investments,

### Kinchloe, WCC, Flowers, and TAF)

195.   The SEC realleges and incorporates by reference paragraphs 1 through 169 above.

196.   As alleged above in paragraphs 21 through 62 and 163 through 169, among other allegations, Defendants Carter, 808 Investments, Kinchloe, WCC, Flowers, and TAF acted as unregistered broker-dealers by, among other things, soliciting investors and effectuating transactions in 808 Renewable securities for transaction-based compensation.

197.   By engaging in the conduct described above, Defendants Carter, 808 Investments, Kinchloe, WCC, Flowers, and TAF, and each of them, made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any exemptions

promulgated pursuant to Section 15(a)(2) of the Exchange Act, 15 U.S.C. § 78o(a)(2).

198.   By engaging in the conduct described above, Defendants Carter, 808 Investments, Kinchloe, WCC, Flowers, and TAF have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Carter, 808 Renewable, 808 Investments, Kirkbride, Kinchloe, WCC, Flowers, and TAF, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendants Carter, 808 Renewable, 808 Investments, Kinchloe, WCC, Flowers, and TAF, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendants Carter, 808 Investments, Kinchloe, WCC, Flowers, TAF, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

## V.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendants Carter, 808 Renewable, 808 Investments, Kirkbride, Kinchloe, WCC, Flowers, TAF, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from soliciting, accepting, or depositing any monies from actual or prospective investors in connection with any offering of securities, provided, however, that such injunction shall not prevent the defendants from purchasing or selling securities listed on a national securities exchange for their own personal account.

## VI.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## VII.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VIII.

Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar Defendants Carter, 808

Renewable, 808 Investments, Kirkbride, Kinchloe, WCC, Flowers, and TAF from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

## IX.

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], bar Defendants Carter and Kirkbride from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## X.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## XI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  November 17, 2016

*/s/ David Van Havermaat*

David Van Havermaat
Yolanda Ochoa
Attorney for Plaintiff
Securities and Exchange Commission